

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA



| | | |
|---|---|---|
| ELLEN L. BATZEL, | ) | CV 00-9590 SVW (AJWx) |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING SUMMARY JUDGMENT |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT SMITH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**Background**

The Museum Security Network (MSN) is an internet website that publishes newletters on art and museum security issues. MSN is operated out of the Netherlands. Ton Cremers is the sole operator of MSN. Initially MSN was funded by a museum in the Netherlands but this museum eventually pulled out and MSN was in danger of folding. Steve Keller, a museum security consultant, advised an executive at Mosler, Inc., an American company that makes security devices for museums and other businesses, that MSN was badly in need of funding and that the sponsorship would be relatively inexpensive to Mosler. Keller represented that Mosler "could not expect any editorial control or censorship but I know Ton [Cremers] well and know that he will appreciate the sponsorship and will adequately represent the interests of the sponsors with regard to the editorial content."

Mosler and MSN subsequently entered into a sponsorship

agreement that stipulated the number of publications of the newsletter and the nature of the subscribers. It included the type of recognition Mosler was to get on the website. Further, it provided that Mosler would not direct the content of the newsletter and that MSN would indemnify Mosler for any legal liability arising from false and libelous information published on MSN. The agreement was entered into on July 13, 1999. Although there was one other minor sponsor for part of the period of Mosler's sponsorship, Mosler negotiated to be the sole corporate sponsor.

Bob Smith did a house painting job for Plaintiff Ellen Batzel on her house in North Carolina. Batzel is an entertainment lawyer with art industry business and a number of Jewish clients. Smith asked Batzel to take a script to her clients to review; she declined saying that she never does this. Smith was apparently angry with this reply.

Smith located the Museum Security Network (MSN), and allegedly sent an e-mail to Cremers. The email said that he, Smith, had been working in the home of a lawyer who claimed to be the granddaughter of Heinrich Himler and who bragged about having an art collection stolen from Jewish families. Cremers published the email and related updates on five occasions in September 1999 allegedly without investigating the veracity of the information. The tenor of the subsequent publications suggested that MSN itself had investigated the allegations.

Batzel learned of the publication of this information from an anonymous emailer on January 4, 2000. She contacted MSN and Mosler requested a retraction. None was published. MSN also did not advise people who inquired that the allegations were false.

Cremers requested a renewal of the Mosler sponsorship in July 2000. Pearce, a Mosler executive, processed an $8000 check to Mosler in August 2000, allegedly after ascertaining that a lawsuit had not been filed by Batzel. In early September, Mosler referred attendees at a conference to the MSN website for more information about Mosler.

As a result of the publication of Smith's story, Batzel alleges that she lost several prominent clients and the North Carolina Bar investigated her.

Batzel is now suing Bob Smith, Ton Cremers, Mosler, and the Netherlands Museum Association for defamation. Mosler is moving for summary judgment on the grounds that it can not be held liable for any defamation committed by Cremers or MSN.

**II.     Analysis**

California choice of law rules indicate that a court is to apply California law. If a party wishes to argue for the application of a different body of law, that party bears the burden of presenting evidence indicating that the law of another state or a foreign state should be applied. <u>Sommer v. Gabor</u>, 40 Cal. App. 1455, 1468-69, 48 Cal. Rptr. 2d 235, 243(Ct. App. 1995)(quoting <u>Clothesrigger, Inc. v.</u>

GTE Corp., 191 Cal. App. 3d 605, 614, 236 Cal. Rptr. 605 (1986)). No party in this case has either argued for the application of a different body of law or produced evidence indicating that another body of law should be applied. Indeed, Mosler and Batzel agree that the defamation law to be applied to this motion is California law. Hence, the Court will apply California law.

Batzel argues that Mosler should be held liable for Cremers/MSN's activities because MSN was Mosler's agent. Additionally, she argues that Mosler operated as a publisher for MSN's newsletter by virtue of the funding it gave MSN. A principal or sponsor must have an ability to direct or control the agent's liability in order for a sponsor to be subject to principal/agent liability. See, e.g., McCollum v. Friendly Hills Travel Center, 172 Cal.App.3d 83, 91 (Ct. App. 1985) ("'The significant test of an agency relationship is the principal's right to control the activities of the agent. [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent; the existence of the right establishes the relationship.' (Stevens v. Roman Catholic Bishop of Fresno (1975) 49 Cal.App.3d 877, 887, [123 Cal. Rptr. 171.])").

In determining whether a particular relationship is a principal-agent relationship, the cases rely heavily on the facts of each individual scenario to determine whether the ability to control is present. See, e.g., Bonetti v. Double Play Tavern, 126 Cal. App.

4

2d Supp. 848 (App. Dep't Sup. Ct. 1954); Mann v. Nutrilite, 136 Cal. App. 2d 729 (Ct. App. 1955). Although Plaintiff argued that being the sole financial sponsor of a publication was sufficient for liability, Plaintiff could not cite any case in support of this point. But cf. Matson v. Dvorak, 40 Cal. App. 4th 539, 542, 46 Cal. Rptr. 2d 880, 882 (Ct. App. 1995) (holding that the sponsor must take a responsible role in the publication)[1] Plaintiff also contradicted this argument in response to questions surrounding hypotheticals posed by the Court at the February 26, 2001 hearing on this motion.

The case relied by the Plaintiff is Bonetti v. Double Play Tavern, 126 Cal. App. 2d Supp. 848 (App. Dep't Sup. Ct. 1954). The circumstances of Bonetti are quite different from the case before this Court. Bonetti did not concern a publication but the sponsorship of a baseball team. Secondly, it involved not the tort of defamation but a personal injury tort. Thus, while it, and the case relied on by defendant Mosler, are instructive in a general manner, neither provides a blueprint for deciding this case.

In Bonetti, the defendant bar sponsored a baseball team which played in a night league in San Francisco. The uniforms bore the Double Play Tavern logo. None of the players were employees of

---

1. "One whose only contribution to a political campaign is financial, and who otherwise is not involved in the preparation, review or publication of campaign literature cannot be subject to liability in a defamation action for statements contained in the publication even if it is established that the statements are false and published with malice."

5

1  the tavern and the manager, also not an employee of the tavern, was a
2  volunteer. Following a game, a player threw a ball which struck
3  Plaintiff; Defendant was held liable. The Court found that tavern
4  had sufficient ability to direct and control the operation to
5  constitute a master servant relationship:
6      this was a baseball team, assembled to represent the
7      Double Play Tavern; to do so in championship style, if
8      possible; to reflect glory on the sponsor as well as on
9      the team; the incidental expenses of its operations
10     were taken as a deductible business expense on the
11     tavern's income tax returns, and the effort was
12     directed and controlled to achieve a beneficial result
13     to Double Play Tavern.
14 Id. at 850-51.
15     The opposite result was reached in Mann v. Nutrilite, 136
16 Cal. App. 2d 729 (Ct. App. 1955). This case also involved a baseball
17 team, which was sponsored by four defendants. One of the players on
18 the team threw a ball to the batter but the ball descended at a
19 sharper angle than she thought it would and struck plaintiff, a
20 chaperone. Nutrilite was one of the sponsors, and the largest
21 sponsor, of B.P. Kids. B.P. Kids sponsored a series of children's
22 baseball teams. BP Kids not only supported baseball teams but also
23 had a general fund for such things as dancing and entertainment.
24 This particular baseball team, the Pirates, had "Nutrilite" sewn on
25

its uniforms although the manager of the league had neither requested nor received permission from Nutrilite to do this. The Court found that there was insufficient direction and control by Nutrilite to hold it liable:

> Aside from one piece of hearsay there is no evidence that either of these corporations had anything to do with the placing of the name "Nutrilite" on these uniforms, and there is no evidence that the presence of that name gave them any right of control. If, as argued, the evidence justifies the inference that the they must have known that this had been done and that they derived some advertising value therefrom, this was not sufficient to show that a right to control existed. The evidence conclusively shows that neither of these was a substantial contributor to the civic program carried on by the B.P. Kids, Inc. it was only one of such contributors, and the fact that certain persons connected with these corporations at times took an interest in the civic activities being conducted by B.P. Kids, Inc. shows no more than a commendable interest on the part of those individuals in the youth activities of the community.

Id. at 735-36.

Though these cases consider financial support as a factor in creating an agency relationship, they are again not publication cases but baseball sponsorship cases. Moreover, the provision of financial support to the baseball teams in these cases was not dispositive. The involvement and control of the sponsoring organization in the alleged agent's activities were crucial as they are for determining liability in this case.

While the baseball cases before the Court are limited in their usefulness because they do not involve publication, publisher cases are also of limited usefulness in this situation because they frequently involve a traditional publisher rather than a mere financial sponsor. The very nature of the publisher relationship necessarily gives the publisher the right to control. Hence, it is not always necessary that publisher exercise its control in order to be held liable for its agents' actions. See, e.g., Davis v. Hearst, 160 Cal. 143, 170 (1911). It is apparent both from the non-existent role Mosler played in the actual publication of the newsletter and from the contract between Mosler and Cremers/MSN, that Mosler was not a publisher and thus that publisher liability cases do not apply to the present situation.

In the face of the limitations imposed both by the publisher and sponsorship cases, Plaintiff argues that there are important differences between the internet and other more traditional sponsorship and publisher scenarios. Plaintiff, however, argues

generalizations about differences presented by the internet without producing any competent evidence as to why the internet is different from cases dealing with publishers and sponsors. The Court finds that an internet sponsor still must fit extant principal-agent law, and in particular, within the control element of a principal-agent relationship.

The facts here do not support characterization of this sponsorship as an agency relationship. As Plaintiff correctly points out, Mosler has been nearly the sole financial support for MSN for the past couple of years and Cremers' activities such as attending conferences and publication were dependent on Mosler money. The Plaintiff points to the sponsorship agreement to show control. This contract does show that MSN was obligated to Mosler to produce a certain number of editions of the newsletter and distribute it to certain clients. These requirements are limited to the frequency of newsletter production and the type of newsletter distribution. There is no evidence in the contract of Mosler exercising or having any ability to exercise any control over the content of MSN's publications.

Conversely, the agreement contains a clause where Mosler explicitly disclaims any editorial control over the content of MSN's publications. See Sponsorship Agreement, Ex. 1, Decl. of Pamela S. Meyers, at ¶9. Further, while Batzel points to Keller's statements as indications of control, Keller's statements actually clearly

indicate that, though Cremers might be generally concerned with protecting Mosler's advertising interests, this would not extend so far as giving Mosler any opportunity to influence the contents of the newsletter. Thus, not only is there no evidence of control there are explicit statements showing lack of control. Plaintiff has failed to produce evidence demonstrating Mosler's ability to control the content of MSN/Cremers's newsletter. Plaintiff's only evidence is that it was MSN's principal advertiser. As a matter of law, this evidence does not establish the agency relationship. See, e.g., McCulloch v. Ford Dealers Advertising Assn. of Southern California, 234 Cal. App. 3d 1385, 1389-90, 286 Cal. Rptr. 223, 226-27 (Ct. App. 1991)(holding that advertisement and sponsorship alone is insufficient to render the advertiser the guarantor of the truth of all statements made in a publication).

Plaintiff also argues that Mosler can be held liable because Mosler's August 2000 payment constituted ratification of Cremers' actions. As Plaintiff correctly conceded at the February 26, 2001 hearing on this motion, in order for there to be liability via ratification, there must already be some principal-agent relationship; ratification alone can not create a principal-agent relationship. See, e.g., Murillo v. Rite Stuff Foods, 65 Cal. App. 4th 833, 852 (1998); McChristian v. Popkin, 75 Cal. App 2d 249, 256 (1996); Coats v. Construction, 15 Cal. App. 3d 908, 914 (1974).

Here, as noted above, there is no underlying agency relationship so there is no liability via ratification.

Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

DATED: 3/20/01

STEPHEN V. WILSON

UNITED STATES DISTRICT JUDGE

11